**In re GYPSUM CASES.**

**Civ. No. 46414–A AJZ.**

United States District Court,
N. D. California.

Aug. 19, 1974.

Frederick P. Furth, John H. Boone, San Francisco, Cal., liaison counsel for plaintiffs.

Samuel H. Seymour, Williams, Connolly & Califano, and Joseph D. Tydings, Danzansky, Dickey, Tydings, Quint & Gordon, Washington D.C., for first owner-builder class.

Mitchell A. Kramer, Philadelphia, Pa., and Farella, Braun & Martel, San Francisco, Cal., for dealer-wholesaler class.

Harvey S. Kronfeld, Mesirov, Gelman, Jaffe & Levin, Philadelphia, Pa., for applicator-subcontractor class.

William C. Barnard, Sommer, Tinkham, Barnard & Freiberger, Indianapolis, Ind., for general contractor class.

Lee A. Freeman, Freeman, Freeman & Salzman, Chicago, Ill., and Josef D. Cooper, San Francisco, Cal., for governmental class.

## ORDER DIRECTING PAYMENT OF ATTORNEYS' FEES

ZIRPOLI, District Judge.

After duly noticed evidentiary hearings held on April 22, 23 and 25, 1974, the court is prepared to fix and direct the payment of attorneys' fees in this antitrust litigation, in which, probably more than in any other such litigation, the congressional objective of private antitrust enforcement was realized.[1] To achieve this result it took seven years of vigorously contested litigation involving a nationwide price fixing conspiracy on the part of the major manufacturers of gypsum products—litigation initiated and prosecuted throughout all these years without benefit of any governmental assistance whatsoever.[2]

Under such circumstances, the attorneys for their able and arduous efforts in litigation involving complex and novel issues of substantial magnitude and doubtful success and undertaken at substantial financial risk on a contingency basis are clearly entitled to reasonable attorneys' fees commensurate with the benefits conferred upon purchasers of gypsum products. The purchasers of such products who benefited from this litigation might otherwise have been denied any protection or benefit whatsoever, since their claims individually would for the most part hardly justify the time and expense of litigation.

While counsel are entitled to adequate attorneys' fees commensurate

1. During the eighty-three years of national antitrust policy, to this court's knowledge, there has never been a larger recovery based exclusively on private enforcement without benefit of an assist from the government. It is estimated that with earned interest as of November 1974, the initial settlement of $67,640,000 should total approximately $75,000,000. Additionally, it should be noted: (1) that in the pilot "dealer" cases, which were tried both as to liability and damages (Wall Products Co. v. National Gypsum Co., et al., 326 F.Supp. 295 and 357 F.Supp. 832), the six dealer plaintiffs were granted treble damages judgments totaling $3,171,702; and (2) that by reason of the abandonment of the conspiracy by defendants in the course of this litigation and their return to competitive pricing practices there was a resultant dramatic drop in the selling price of gypsum products. By way of illustration, after termination of the conspiracy in 1968, the basic price for ½″ wallboard of $49.00 per MSF dropped to $36.00 and the basic price of ⅝″ wallboard of $71.50 per MSF dropped to $57.00. The savings to purchasers of such products during the years 1968, 1969 and 1970 alone (and at a time when prices generally were going up in the construction industry) were $86,813,265. The 1968 sales of gypsum products totaled $305,605,000 and the price went down 3.6% for a savings of $11,246,265. In 1969 the sales were $319,317,000 and the price went down 8.32% for a savings of $26,567,000. In 1970 the sales were $268,000,000 and the price went down 18.35% for a savings of $49,000,000.

2. These were multidistrict antitrust actions privately instituted without the benefit of prior convictions, pleas of guilty or nolo contendere of the defendants, civil decrees (by consent or otherwise) or other governmental action. In fact, the United States of America did not assert its claim for damages until one day before the running of the statute of limitations.

with the fund created and the prevention of future corporate abuse in the gypsum industry (see footnote 1, *supra*), they seem to have forgotten that the equity power of the court to award attorneys' fees and thus reward them as vindicators of public policy is definitely limited by the caution that such awards, though they shall not be niggardly, must be reasonable attorneys' fees, no more and no less. Otherwise the recompense would overshadow the result achieved and diminish the settlement fund to the point where the individual class member obtains only a token recovery.

In the instant litigation, the applications for attorneys' fees filed by twenty-eight petitioners total in excess of $20,000,000, an exaggerated and untenable figure which only serves to make more difficult and more distasteful the exercise of the court's discretion in the evaluation of these claims. The resultant evaluations will probably prove to be totally satisfactory to no one.

Mindful that "[f]ew subjects associated with the class action device have generated as much critical commentary in recent years as the matter of attorneys' fees", Alpine Pharmacy v. Chas. Pfizer, 481 F.2d 1045, 1049 (2d Cir. 1973), the court has separately reviewed, analyzed and evaluated each of the claims. In so doing, it has reviewed the various tabulations of attorneys' fees and the guidelines suggested by counsel in their respective memoranda in support of their applications and the record made at the evidentiary hearing thereon, and indeed the record made throughout the entire history of this litigation.

These tabulations (and even the suggested guidelines) are meaningless without detailed knowledge of (1) the time and labor properly employed by the attorneys in the processing of these cases; (2) the quality of the services rendered; (3) the scope of the activity and conspiracy under attack; (4) the financial risk involved and contingent nature of the action undertaken; (5) the magnitude, complexity and novelty of the issues involved; (6) the true measure of the beneficial results achieved, including the prophylactic effect thereof; and (7) the degree to which, if any, plaintiff's efforts were supported by prior governmental action.[3]

These factors, which are controlling and of which this court has first-hand knowledge, having lived with this litigation and every facet thereof over the past seven years, rather than a percentage of success[4] formula suggested by some counsel, are the factors employed by the court in the exercise of its discretion in the making of the awards hereinafter provided.

*Background.*

Before making an evaluation and award on the respective applications, a brief review of the history and nature of this litigation is in order.

On January 27, 1967, the first gypsum case, Wall Products Co. et al. v. National Gypsum Co. et al., 326 F.Supp. 295; 357 F.Supp. 832; 367 F.Supp. 972, was filed by the law office of Frederick P. Furth on behalf of a "dealer" (direct purchaser from the manufacturer for resale). By March 1, 1967, suits had been filed against United States Gypsum Company (USG), National Gypsum Company (National), Kaiser Gypsum Company (Kaiser). The Flintkote Company (Flintkote), and Fibreboard Company (Fibreboard) by three dealers

---

3. See Brandenburger v. Thompson, 494 F.2d 885 (9th Cir. 1974), wherein the court in remanding the case to the district court for determination of reasonable attorneys' fees to be paid counsel for plaintiff suggested that "the district judge might consider the factors referred to" in the cases of Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974), and Lindy Bros. Bldrs., Inc. v. American R. & S. San. Corp., 487 F. 2d 161 (3d Cir. 1973). See also City of Detroit v. Grinnell, 495 F.2d 448 (2d Cir. 1974); Arenson v. Board of Trade, 372 F. Supp. 1349 (N.D.Ill.1974).

4. For a compilation of cases wherein the court awarded fees as a percentage of the treble damages or settlement, see footnote 14 in Arenson v. Board of Trade, *supra.*

and an applicator represented by the Furth office, two dealers represented by the Weir office and four builders and one applicator represented by the Alioto office. All cases were assigned to this court and discovery was coordinated. By the end of 1968, twenty-four significant depositions were taken, extensive interrogatories were exchanged and in excess of 500,000 documents were copied or inspected.

These initial filings were followed by a wave of suits instituted in this district and throughout the country covering every marketing level of the gypsum industry. These cases, which totaled in excess of 140 with approximately 5,500 named plaintiffs, were eventually transferred to this court by the Judicial Panel on Multidistrict Litigation. Through the years and in the course of the pretrial of these cases, forty-two major pretrial orders, preceded by pretrial hearings, and ten postsettlement orders were issued relating to a myriad of problems, including designation of and procedure for operation of document depositaries for plaintiffs and defendants; pass-on, remoteness, statute of limitations and Robinson-Patman defenses; summary judgment estopping denial of liability on the part of the major manufacturers of gypsum products; counterclaims, set-offs and liens; designation of classes, representative cases and representative counsel for each class; decertification; approval of settlements; awarding of costs and attorneys' fees and supervision of all distribution procedures.

By stipulation of counsel entered on November 27, 1968, the parties then before the court waived jury trial and agreed that the court could designate the first case or cases and the first issue or issues to be tried. Having before it twenty-four cases involving direct sales to six dealers in gypsum wallboard, the court concluded that these should be the first to be tried since they represented the first line of contact with the manufacturers, could be effectively managed and could well be the lead or pilot cases from which to determine the liability is-

sue in all cases. Thereafter, pursuant to pretrial orders issued on April 1, 1969, and June 26, 1969, the "dealer" cases were ordered to trial on the issue of alleged violations of Section 1 of the Sherman Act (15 U.S.C. section 1) with the understanding that if liability were established, the trial on the damages issue would follow and that in the interim all discovery would be stayed in the remaining (backburner) cases until the further order of the court. It was further understood that all discovery in the dealer cases would be applicable to the remaining cases.

The trial of the liability issue in the dealer cases commenced on October 20, 1969, and on March 19, 1970, the taking of evidence was concluded. Following the trial, the parties submitted proposed findings of fact, with specific references to the transcript of record and exhibits and extensive supporting briefs. On March 18, 1971, the court found that USG, National and Kaiser had conspired among themselves and with others to stabilize and maintain the price level of gypsum wallboard through a course of interdependent conscious parallel action pursuant to a tacit understanding by acquiescence coupled with assistance, which conspiracy remained in full force and effect throughout the years 1966 and 1967. On plaintiffs' further liability claim that defendants had acted in restraint of trade during the years 1963, 1964 and 1965 by reason of their price verification practices, the court concluded that defendants were acting in good faith compliance with the provisions to the Robinson-Patman Act "by meeting but not beating" competitive price deviations. Hence the court found no liability for the years 1963, 1964 and 1965. Prior to the trial Flintkote had settled with plaintiffs, and at the conclusion of plaintiffs' case Fibreboard was dismissed from the cases. The court's findings on the liability issues can be found at 326 F.Supp. 295.

Following further discovery, including answers to transaction interrogatories, the second phase of the trial of the deal-

er cases was held to determine the actual damages sustained by the six dealer plaintiffs. Because of settlement negotiations pending between plaintiffs and Kaiser (which were eventually successfully concluded), Kaiser was not included as a defendant in the trial of the damages issues. At the conclusion of that trial and after submission on briefs, on April 13, 1973, the court entered treble damages judgments in favor of the six dealer plaintiffs and against USG and National in the sum of $3,171,702. For a review of the damages awards see 357 F.Supp. 832.

The magnitude of the processing of the pilot "dealer" cases alone is readily apparent when one considers that the trial of the two separate stages above indicated took up 120 trial days, with docketed pleadings, motions, etc. in excess of 5,500 and trial transcripts in excess of 100 volumes.

In the course of the "dealer" litigation and after the liability issue had been resolved by the court, the stay order on the "backburner" cases was lifted and discovery in these cases was renewed and vigorously pursued. The court, for policing purposes, on June 25, 1971, entered its pretrial order No. 29, wherein Frederick P. Furth was named as liaison counsel for all plaintiffs and Morris M. Doyle was named as liaison counsel for all defendants, including The Cellotex Corporation (Celotex) and Georgia-Pacific Corporation (Georgia-Pacific) not named in the pilot dealer cases, with the following basic responsibilities: (1) to act as primary spokesmen at all future pretrial conferences; (2) to act as conduits for the receipt and forwarding of all pleadings, motions, notices and all other papers from and to all parties and as conduits through which all communications with the court must pass; (3) to notify the court of all responses and actions concerning pretrial discovery and pretrial pleadings; (4) to call all conferences of counsel; (5) to consider the possibility of joint responses or actions or joint briefs; (6) to work out all stipulations and agreements with the opposing side; and (7) to conduct all settlement negotiations. Mr. Furth was selected as liaison counsel for plaintiffs because of the skill and dedication manifested by the success already attained and because he, of all counsel, could act with the least possible conflict of interests. The wisdom of that selection was subsequently verified by his demonstrated ability to coordinate the activities of the numerous plaintiffs' counsel into a unified litigation effort with a minimum of internecine squabbles.

On December 22, 1971, the court entered partial summary judgment estopping USG, National and Kaiser from denying liability for the years 1966 and 1967 as to all plaintiffs in all the cases and on April 12, 1972, the court established the appropriate classes for this litigation. The classes established were:

(1) Dealer-Wholesaler Class;

(2) Applicator or Subcontractor Class;

(3) General Contractor Class;

(4) National Governmental Class (excepting therefrom the states indicated in (5) below and the United States of America);

(5) Statewide Governmental Classes consisting of a statewide governmental class for each of the states of Arizona, California, Colorado, Connecticut, Idaho, Illinois, Indiana, Kansas, Maryland, Nevada, New Jersy, New Mexico, North Dakota, Oregon, South Dakota, Tennessee, Texas, Washington, West Virginia and Wisconsin;

(6) First Owner-Builder Class.

Thereafter, in November of 1972, the court designated the representative case and representative counsel for each of the classes established by the court, and full scale discovery was soon underway in an effective team effort with substantial responsibilities assigned to representative counsel for each class. This concerted effort was aimed particularly at the alleged conspiratorial activities of Celotex, Georgia-Pacific, Flintkote, and Fibreboard, companies not bound by the *Wall Products* estoppel judgment, and all remaining unresolved issues. The court set hearing dates on all the remaining

issues, which for the most part had already been briefed, and it set November 29, 1973, as the trial date for all issues in all the cases covering the years 1963 through 1967. Following publication of the court's damages opinion entered on April 13, 1973, in the "dealer" cases and pending appeal of its rulings in these cases and its partial summary judgment of estoppel against USG, National and Kaiser, all parties entered into serious settlement negotiations which were finalized in August of 1973 and submitted to the court for its approval. At a hearing on November 29, 1973, the court approved the settlement with the unanimous support of the attorneys present. The resultant settlement fund, $67,640,000, is presently drawing interest at a rate in excess of ten percent and, as previously indicated, by November 1974, should total approximately $75,000,000. This unanimity of agreement was in great measure possible because representative counsel for each class was an attorney of record for only plaintiffs in the class he represented. This enabled counsel in each class to negotiate at arm's length with counsel in all other classes and permitted them to resolve their interclass differences over pass-on and remoteness issues in a fair and equitable manner for all concerned.

The formula agreed upon by *all* counsel for all classes and approved by the court for distribution of the settlement fund, after deducting costs and expenses and attorneys' fees, provides for the following percentages of distribution:

| | |
|---|---|
| Dealer-Wholesaler Class | 21.15% |
| Applicator or Subcontractor Class | 21.15% |
| General Contractor Class | 10.80% |
| Governmental Class (50 states and all subdivisions thereof) | 10.00% |
| First Owner-Builder Class | 36.90% |

Because liability of the manufacturers for the years 1963, 1964 and 1965 remained as an issue in the "backburner" cases and as an issue subject to the pending appeal in the "dealer" cases, it became a factor in the settlement of the cases and was resolved by the court by an order (approved by all parties) wherein the court allotted the following weight for each unit of purchase:

| Calendar Year | Weight |
|---|---|
| 1963 | 1 |
| 1964 | 1 |
| 1965 | 1 |
| 1966 | 2 |
| 1967 | 2 |

With approval of the settlement, following a hearing after notice by mail to each of 471,315 individuals and business entities and publication in six trade journals, the defendants were dismissed in all the cases,[5] the appeals in the dealer cases are now moot and postsettlement hearings were held to work out the mechanics for approval of claims and distribution of the settlement fund in accordance with the formulas above indicated. The total number of claims filed for such processing is approximately 72,000.

While there remains a substantial amount of work to administer the settlement fund and effect the processing and approval (or disapproval) of the claims and the distribution of the fund, the court is satisfied that this will be performed with the same quality and efficiency that have characterized counsel's efforts in the past.

Before awarding the attorneys' fees with appropriate indications of the time and manner in which such fees shall be paid and the portion of the settlement fund from which each payment shall be made, all of which is essential before distribution to approved claimants in each class can be made with exactitude, the court deems it proper to note that were it not for the quality, skill, integrity, industry and team effort of counsel

5. The only significant plaintiff who opted out of the settlement agreement was Universal Wallboard Co., an applicator, represented by the Alioto law office. The United States of America also remains as a party plaintiff in one of the cases since it was not included in the settlement agreement.

for all parties to this litigation,[6] these cases would have been unmanageable and the monumental and effective private law enforcement of the antitrust laws here achieved would not have been possible.

*The Attorneys' Fees Applications*

Based upon the court's knowledge of every detail of this litigation and the information reflected at the hearings on the applications for attorneys' fees, the court, after giving due consideration to the factors recited on page 3 of this order, each of which is applicable to this litigation, is prepared to and does now award attorneys' fees as hereinafter set forth.

*Liaison Counsel and Representatives of Each Class.*

*Frederick P. Furth—Liaison Counsel.*

■ The law office of Frederick P. Furth requests attorneys' fees equal to 10 percent of the entire settlement fund, that is to say, a fee of $6,764,000. While the percentage requested might appear to be reasonable, as already indicated, the court in this case will not apply a percentage formula, but will look to the factors above indicated and base its award on those factors. In so doing the court is mindful of the fact that since December of 1966, Mr. Furth, with the able assistance of Mr. John H. Boone and other counsel in this litigation, has been the chief architect of this entire litigation. His success in the "dealer" cases and his exceptional leadership, patience and steadying influence thereafter as liaison counsel for all plaintiffs led to the ultimate settlement of these cases.

The petition, heard on April 22, 1974, discloses that at the time of the filing thereof the services rendered by the Furth office were as follows:

| | | Furth | Boone | Other Attorneys | Paralegal |
|---|---|---|---|---|---|
| 1. | Depositions and discovery | 1,424 | 905 | 1,065 | 298 |
| 2. | Briefs, pleadings and other court papers | 670 | 1,796 | 1,773 | 2,114 |
| 3. | Trial, hearings and court preparation | 2,004 | 1,349 | 448 | 32 |
| 4. | Consultation with other attorneys and claimants | 597 | 607 | 386 | 340 |
| 5. | Settlement negotiations | 322 | 97 | 24 | –0– |
| 6. | Administrative matters necessitated by multiparty cases | 600 | 438 | 50 | 57 |
| 7. | Miscellaneous activities | 60 | 74 | 91 | 52 |
| | **TOTAL HOURS** | 5,677 | 5,266 | 3,837 | 2,893 |

6. The attorneys in this litigation are all experienced antitrust lawyers who participated as active or lead counsel in most of the major antitrust litigation of the past twelve years, including electrical equipment, bleachers, rock salt, children's books, plumbing fixtures, concrete pipe, liquid asphalt, tetracycline, brass mill tubing, and automobile air pollution control cases.

These hours include 120 days in actual trial time and almost equal time in pre-trial hearings. Under the circumstances, based upon community standards for attorneys' fees, the court finds $100 per hour to be reasonable for the services rendered by Mr. Furth and Mr. Boone, $50 per hour for the services rendered by associate counsel, and $15 per hour for the paralegal services. This brings the total for all such hourly services rendered by the Furth office up to April of 1974 to $1,329,545 ($1,094,300 plus $191,850 plus $43,395).

However, the finding of a reasonable hourly rate for each attorney "does not end the inquiry," for the court must also look to the other factors which are of major significance in this litigation. These other factors are those hereinbefore set forth and they all apply most favorably to the services rendered by the Furth office and indeed to the services rendered by all counsel in this litigation.

This litigation, which involved complex and novel issues of substantial magnitude arising out of alleged conspiratorial activities in restraint of trade of nationwide application, was undertaken by the Furth office on a contingency basis at substantial financial risk (the costs and expenses in the "dealer" cases alone exceeded $150,000) with the result in doubt until the court's opinion of April 13, 1973, and indeed until the approval of the settlement and dismissal of all defendants on November 29, 1973, thereby rendering moot pending appeals on meritorious issues, which if ruled upon adversely to plaintiffs could well have resulted in a disastrous ending to all of the time, money and effort of counsel for all parties. To this contingency factor must be added the fact that without one iota of governmental assistance, counsel, and in particular the Furth office, by diligent and unrelenting application of their skills and their labors achieved an astounding settlement of $67,640,000 and an end to further corporate abuse in the gypsum industry, which for the years 1968, 1969 and 1970 alone saved purchasers of gypsum products $86,813,265.

With all these factors in mind, if private enforcement of the antitrust laws is to be expected and encouraged, it is in this court's view eminently reasonable to multiply the hourly value above set forth by a weighted factor of 3, thereby bringing the total reasonable fee earned up to April of 1974 to $3,988,635. To this figure must be added the additional services which will be required to complete administration and final distribution of the fund. This could well take another year. As of June 28, 1974, and since the April hearing for this purpose, the Furth office, through Mr. Furth and four lawyers and five paralegal assistants, has already devoted in excess of 2,950 hours to the administration of the settlement fund and it would therefore be reasonable to expect them to devote an additional 6,000 hours of such services before the task of counsel is completed. For this total of an additional 8,950 hours of basically administrative services, compensation at the rate of $30 per hour is reasonable. The court therefore adds an additional $268,500. This brings the total reasonable fee for all services rendered and to be rendered in this litigation by the Furth office to $4,257,135 ($3,988,635 plus $268,500). From this total must be deducted the fees already received by Mr. Furth in the "dealer" cases in the sum of $928,628. Therefore the Furth office is now entitled to $3,328,507, which the court directs shall be paid to Frederick P. Furth from the entire fund, since such services benefited the entire fund and all claimants, represented and unrepresented, in all classes.

*Seymour-Tydings—First Owner-Builder Class.*

■ The next largest request for attorneys' fees is that of the offices of Williams, Connolly & Califano and Danzansky, Dickey, Tydings, Quint & Gordon, represented respectively by Samuel H. Seymour and Joseph D. Tydings, who

jointly acted as court-appointed representative counsel for the largest class of claimants, the First Owner-Builder Class, which will share in 36.90 percent of the total settlement fund. For their services these lawyers request a fee of $3,382,000, which represents 5 percent of the total settlement. Again, the court is of the view that the appropriate basis for compensation is not a percentage formula but the factors heretofore enumerated. With these factors in mind

and further mindful that these attorneys undertook and vigorously pursued the major responsibility of developing the case against Georgia-Pacific and Flintkote, two of the largest defendants not bound by the *Wall Products* judgment, the court proceeds to evaluate the services of the Seymour-Tydings firms.

As of the hearing date of April 22, 1974, the record discloses that the services rendered by the Seymour-Tydings firms were as follows:

| | Seymour and Tydings | Partners | Associates | Law Clerks |
|---|---|---|---|---|
| 1. Depositions and discovery | 1,014.90 | 713.50 | 295.60 | 406.20 |
| 2. Briefs, pleadings and other court papers | 905.75 | 364.50 | 597.10 | 362.70 |
| 3. Prertial hearings and prepaartion therefor | 515.60 | 34.70 | | |
| 4. Damage studies | 161.95 | 322.20 | | 129.70 |
| 5. Settlement-inter-class | 241.60 | 165.00 | | |
| 6. Settlement with defendants | 352.50 | 72.20 | | |
| 7. Notices to classes | 52.70 | 33.30 | 21.10 | 63.90 |
| 8. Settlement administration | 380.30 | 232.90 | 214.40 | 77.30 |
| 9. Consultation with counsel | 403.00 | 157.80 | 62.50 | |
| 10. Miscellaneous | 118.05 | 45.00 | 6.60 | |
| TOTAL HOURS | 4,146.35 | 2,141.10 | 1,197.30 | 1,039.80 |

Applying the same community standards applied throughout this order, the court finds $100 per hour to be reasonable for the services rendered by Mr. Seymour and Mr. Tydings and their partners, $50 per hour for the services rendered by their associates, and $15 per hour for the services of law clerks. This brings the total for all such hourly services rendered by the Seymour-Tydings firms as of April 1, 1974, to $704,207 ($628,745 plus $59,865 plus $15,597).

▇▇▇ Again, the hourly rate does not tell the full story. Here the factors that apply to the Furth firm are applicable to the experienced antitrust attorneys of the Seymour-Tydings firms, who rendered skilled and effective services. They too undertook the litigation on a contingency fee basis at substantial fi-

nancial risk (costs and expenses incurred up to April of 1974 were in excess of $86,000) with a favorable result in doubt since counsel represented the last level of marketing and had to overcome the important issue of remoteness. This they accomplished, and considering that they were able to have 36.90 percent of the settlement allotted to the members of their class, it is reasonable to multiply the hourly value set forth above by a weighted factor of 2.2, thereby bringing the total reasonable fee earned up to April of 1974 to $1,549,255. Counsel for this class have enormous administrative responsibilities yet to be fulfilled since they, together with Mr. Mark R. Joelson (whose fee application is hereinafter separately considered), have the responsibility of processing all claims in the First Owner-Builder Class, by far the largest number of claims filed. Toward this end since April 1, 1974, Mr. Tydings and five lawyers from his office and Mr. Seymour and two lawyers from his office have already spent a total of 1,408 hours. They can reasonably be expected to devote an additional 4,000 hours to such services. They therefore are entitled to additional fees for these 5,408 hours of administrative services at the rate of $30 per hour.

This adds $162,240 to their previous figure of $1,549,255 for an overall total of $1,711,495. To the degree that it is possible to do so, the court must make allowance for the contingency fee arrangement of these attorneys with the approximately 270 plaintiffs they represent in the case of Sutton Towne Associates et al. v. Fibreboard Corporation et al., Civil No. 69–565.[7] Based upon its best estimate, the court finds the figure of $100,000 to be reasonable, and therefore deducts the same from $1,711,495. Accordingly, the fee to which the offices of Seymour and Tydings are now entitled is the sum of $1,611,495, which the court directs shall be paid from the fund available for distribution to the unrepresented claimants in the First Owner-Builder Class.[8]

*Mitchell A. Kramer and Farella, Braun & Martel—Dealer-Wholesaler Class.*

Petitioners, Mitchell A. Kramer and Farella, Braun & Martel, co-counsel and representative counsel of the Dealer-Wholesaler Class, have applied to the court for an award of attorneys' fees in the amount of $1,500,000 as compensation for services rendered and benefit conferred upon the Dealer-Wholesaler Class.[9]

7. All counsel of record in this litigation were required to submit to the court for *in camera* inspection their respective contingency fee contracts.

8. The services rendered by the offices of Seymour and Tydings, while benefiting all classes, as the services of all lawyers in this litigation did to a greater or lesser degree, were primarily for the benefit of the class they represent and properly should come from the unrepresented members of such class. The First Owner-Builder Class will share in 36.9% of the total fund available for distribution. This means that approximately $27,000,000 will be available for distribution to the members of the First Owner-Builder Class, and since about 75% of that class is unrepresented, approximately $20,400,000 will be available for distribution to unrepresented claimants.

9. The amount distributable to this class, 21.15% of the total distributable funds, should be approximately $15,600,000.

As of the date of the hearing of April 22, 1974, the record discloses that the services rendered by Mr. Kramer were as follows:

| | | Kramer | Partners | Associates | Paralegal |
|---|---|---|---|---|---|
| 1. | Preparation of materials and pleadings | 288.50 | | 4.30 | |
| 2. | Response to court's questionnaire | 10.00 | | | |
| 3. | Preparation of summary judgment motions and briefs | 144.00 | | 79.00 | |
| 4. | Brief on class action determination | 35.00 | | | |
| 5. | Reply brief on decertification and statute of limitations | 57.25 | | 3.00 | |
| 6. | Class action notice | 6.45 | | | |
| 7. | Class action interrogatories | 2.00 | | 34.30 | |
| 8. | Transaction interrogatories | 59.85 | | 33.00 | 121.00 |
| 9. | Review of USG documents and production | 157.25 | | | 392.80 |
| 10. | Preparation of interrogatories and requests for production from USG | 8.30 | | 1.30 | 84.25 |
| 11. | Brief on and analysis of settlement | 45.25 | | 44.70 | |
| 12. | Research and construction of claim forms | 8.50 | | | |
| 13. | Research and construction of fee application and briefs | 49.00 | 9.00 | 12.00 | |
| 14. | Miscellaneous research and analysis | 43.25 | 2.60 | 2.00 | |

| | Kramer | Partners | Associates | Paralegal |
|---|---|---|---|---|
| 15. Meetings, hearings and conferences with class representatives | 660.90 | | 65.80 | |
| 16. Miscellaneous | 100.00 | | | |
| TOTAL HOURS | 1,675.50 | 11.60 | 279.40 | 598.05 |

Note: Because petitioner used minutes and the court used fractions of hours employed, there is a slight difference of about one hour in our respective totals.

The record discloses that the services rendered by the firm of Farella, Braun & Martel were as follows:

| | Partners | Associates |
|---|---|---|
| 1. Introduction to case, evaluate defendants liability and compile information re filing action | 85.75 | 50.50 |
| 2. Organize filing and administrative system for class, case and prepare complaint | 28.00 | 22.30 |
| 3. Evaluate class action problems and motion to certify classes | 57.87 | 33.50 |
| 4. Evaluate Robinson-Patman claims | 5.75 | 8.50 |
| 5. Supply initial Kaiser settlement proposal | 10.50 | |
| 6. Oppose statute of limitations defenses and answer transaction interrogatories | 111.50 | 134.25 |
| 7. Appointment as class representative | 11.00 | |
| 8. Plan discovery and prosecution strategy, research re pass-on defense | 131.50 | 84.25 |
| 9. Memo re aggregate class damage and interclass apportionment agreement | 120.00 | 61.50 |
| 10. Research claims under Sec. 2 Sherman Act | 4.00 | 5.50 |
| 11. Negotiate and execute interclass apportionment agreement | 61.50 | |
| 12. Plan proof of damages, discovery, price study re Celotex, USG, Fibreboard | 69.00 | 144.25 |
| 13. Brief re class decertification and fraudulent concealment and opposition to summary judgment | 57.00 | 93.25 |
| 14. Kaiser settlement negotiations | 16.50 | 3.25 |
| 15. Bring government class into interclass apportionment agreement | 22.75 | |
| 16. Georgia-Pacific deposition | 3.50 | |
| 17. Amicus brief re remoteness-Liquid asphalt cases | 6.50 | |

| | Partners | Associates |
|---|---|---|
| 18. Coordinate briefs re defendants three motions | 24.70 | 24.50 |
| 19. Discovery re single plant producers | 6.75 | 2.00 |
| 20. Prepare litigation notice to class claimants | 11.25 | 7.00 |
| 21. Assessments re liaison counsel expenses | 2.25 | |
| 22. Settlement negotiations re defendants | 20.50 | 1.50 |
| 23. Prepare for hearings re decertification, statute of limitations, remoteness | 36.75 | 62.75 |
| 24. Class-settlement notices and administrative details | 91.35 | 32.25 |
| 25. Brief in support of settlement and inter-class apportionment | 36.75 | 57.75 |
| 26. Motion re collateral estoppel | 8.25 | 1.25 |
| 27. Investment of fund | 2.50 | |
| 28. Preparation for and court appearances | 79.50 | 26.25 |
| 29. Re briefs, etc. on costs and attorneys' fees | 18.25 | 24.75 |
| 30. Miscellaneous (too detailed to set out here) | 64.00 | 145.25 |
| TOTAL HOURS | 1,205.42 | 1,026.30 |

———◆———

To these services must be added 1,310.00 hours of paralegal and law clerks' services.

Combining the hourly services of Mr. Kramer and his firm members with that of the Farella, Braun & Martel firm, produces a total of 2,892.52 hours for partners, 1,305.70 hours for associates, and 1,908.05 hours for paralegal and law clerks. Applying the standard of $100 per hour for partners, $50 per hour for associates, and $15 per hour for paralegal and law clerks, the total value for all such services is $383,157 ($289,252 plus $65,285 plus $28,620). While all the factors applied in the court's consideration of the previously made awards, including the same effective service, are applicable to this application, the fact remains that once liability was ascertained in the "dealer" cases the risk to

this class, although ever present until settlement and dismissal of the appeal, was in some degree less than that of other classes, i. e. First Owner-Builder Class. Hence, the court finds the multiple factor reasonably applicable here to be 1.75, thereby bringing the total reasonable fee earned as of April, 1974, to $670,524. Since the report submitted to the court for its April hearing, counsel have expended 681 hours of partners' time, 511 hours of associates' time, and 1,711 hours of paralegal and law clerks' time in administrative services. An additional 1,200 hours for such services will be required.[10] This makes a total of 4,103 additional hours of administrative services rendered and to be rendered, and at $30 per hour entitles counsel to an additional $123,090, which added to $670,524 results in an overall total of $793,614, which the court directs shall

10. The administrative services required for distribution to members of this class should

be less than that of any other class, since only 3,500 claims were filed in this class.

be paid to Mitchell A. Kramer and the firm of Farella, Braun & Martel from the fund available for distribution to the unrepresented claimants in the Dealer-Wholesaler Class.[11] The services of Mr. Guido Saveri, a member of the review committee for this class will be hereinafter separately evaluated when the court considers the fee to be paid to the Alioto firm.

*Harvey S. Kronfeld—Applicator-Subcontractor Class.*

Mr. Harvey S. Kronfeld and Mesirov, Gelman, Jaffe & Levin, court-appointed representative of the Applicator-Subcontractor Class and counsel for named plaintiffs in the case of Altman Bros. of Ohio et al. v. United States Gypsum Company et al., Civil No. 72–642, have requested a fee of 15 percent of the fund distributable to the members of the Applicator-Subcontractor Class.[12] They have waived in open court any contingency fees to which they might be entitled from the *Altman Bros.* case. The fee they thus request is in excess of $2,000,000.

As of the date of the hearing of April 22, 1974, the record discloses that the services rendered by counsel for this class were as follows:

| | | Kronfeld | Partners | Associates | Paralegal |
|---|---|---|---|---|---|
| 1. | Discovery matters | 672.70 | 673.70 | 208.50 | 612.60 |
| 2. | Pleadings, interrogatories, motions, pretrial orders | 151.40 | 67.80 | 99.40 | 56.20 |
| 3. | Interclass settlements | 109.40 | 23.50 | 54.20 | |
| 4. | Answering defendants' interrogatories | 24.90 | 19.00 | 80.30 | 2.00 |
| 5. | Defendants' summary judgment motions | 162.30 | 69.00 | 216.70 | |
| 6. | Pretrial conferences | 114.70 | 15.70 | 12.70 | |
| 7. | Settlements with defendants | 127.20 | 32.50 | 3.30 | |
| 8. | Settlement approval | 162.00 | 117.10 | 13.90 | 13.20 |
| 9. | Class action notices, claim forms and plan of distribution | 121.20 | 151.50 | 24.60 | 99.80 |
| 10. | Processing of claims to 4/1/74 | 206.20 | 240.50 | 4.50 | |
| | TOTAL HOURS | 1,852.00 | 1,410.30 | 718.10 | 783.80 |

11. The services rendered by Mr. Kramer and Farella, Braun & Martel, while in a measure benefiting all classes, were primarily for the benefit of the class they represent, and their fee should come from the unrepresented members thereof. The fund distributable to the Dealer-Wholesaler Class should be approximately $15,600,000; 96% of the fund will be distributed to the unrepresented claimants and only 4% thereof will go to represented claimants.

12. This request was modified at the hearing to 15% of the fund distributable to the unrepresented members of the Applicator-Subcontractor Class. This class will share in 21.15% of the entire fund or approximately $15,600,000. The unrepresented members thereof constitute approximately 93% of the class.

Applying the same community standards heretofore employed, the court finds $100 per hour to be reasonable for the services of Mr. Kronfeld and his partners, $50 per hour for the services rendered by their associates, and $15 per hour for paralegal services. This brings the total for all such hourly services as of April 1, 1974, to the sum of $373,892 ($326,230 plus $35,905 plus $11,757).

The factors herein enumerated also apply favorably to counsel for this class who by vigorous and effective pursuit of the responsibilities assigned to them substantially contributed to the settlement obtained and the end to corporate abuse in the gypsum industry. Here the risk factor was slightly higher than that of the Dealer-Wholesaler Class. Hence the court uses a multiple factor for the Applicator-Subcontractor Class of 1.85, thereby bringing the total reasonable fee for services of counsel for this class up to April 1, 1974, to $691,700. Since the report submitted to the court for its April hearing counsel have expended 904 hours of partners' time, 142 hours of associates' time, and 5 hours of paralegal services for administrative purposes for a total of 1,051 hours. An additional 1,375 hours of such administrative services will be needed. This makes a total of 2,426 additional hours of administrative services rendered and to be ren-

dered, and at $30 per hour entitles counsel to an additional $72,780, which added to $691,700, results in an overall total of $764,480, which the court directs shall be paid to Harvey S. Kronfeld and Mesirov, Gelman, Jaffe & Levin from the fund available for distribution to the unrepresented claimants in the Applicator-Subcontractor Class.[13]

*William C. Barnard—General Contractor Class.*

The General Contractor Class will share in 10.80 percent of the settlement fund which should be approximately $7,900,000. William C. Barnard and the firm of Sommer, Tinkham, Barnard & Freiberger, as court-appointed representative counsel for the General Contractor Class have requested attorneys' fees equal to 10 percent of the fund to be distributed to the members of the class, that is to say, about $790,000. They have waived in writing any contingency fee to which they might be entitled under their contracts with named plaintiffs in Terrace Homes, Inc. et al. v. United States Gypsum Company, et al., Civil No. 70–2678.

At the time of the submission of their application for the hearing of April 22, 1974, the record discloses that the services rendered by Mr. Barnard and the members of his firm were as follows:

| | | Barnard | Partner | Associate |
|---|---|---|---|---|
| 1. | Depositions and discovery | 81.50 | 157.70 | .90 |
| 2. | Briefs, pleadings, motions, etc. | 99.30 | 28.80 | 1.50 |
| 3. | Trials, hearings and related court preparation | 143.90 | 63.90 | |
| 4. | Communications with other attorneys and claimants | 83.30 | 19.60 | .40 |
| 5. | Class notices and plan of distribution | 141.00 | 136.40 | |

---

13. Here too the services rendered by counsel for the Applicator-Subcontractor Class, while in a measure benefiting all classes, were primarily for the benefit of the class counsel represent and should properly come from the fund available to the unrepresented claimants in that class.

| | Barnard | Partner | Associate |
|---|---|---|---|
| 6. Research, legal and economic | 80.80 | 37.00 | 18.70 |
| 7. Settlement negotiations | 69.60 | 16.70 | |
| 8. Negotiations on interclass settlement agreement | 102.30 | 41.20 | |
| 9. Miscellaneous and administrative | 16.00 | 10.50 | |
| 10. Claims review to 4/1/74 | 90.80 | 74.90 | 147.30 |
| TOTAL HOURS | 908.50 | 586.70 | 168.80 |

Applying the same community standards employed in the evaluation of all the applications for attorneys' fees, the court finds $100 per hour to be reasonable for the services of Mr. Barnard and his partners and $50 per hour for the services of associate counsel. This brings the total for such hourly services to the sum of $157,960 ($149,520 plus $8,440).

As an effective member of the team to which the above enumerated factors apply most favorably, counsel for this, the second largest class, are reasonably entitled to a multiple factor of 2, thereby bringing their earned fee to April 1, 1974, to $315,920. Since April 1, counsel for this class have rendered 2,321 hours of administrative services (501 hours for partners, 835 hours for associates, and 985 hours paralegal). To complete the processing of the 22,000 claims filed in this class should reasonably require an additional 2,500 hours (1,500 attorneys' time and 1,000 paralegal time), making a total of 4,821 additional hours for administrative services which at $30 per hour entitles counsel to an additional $144,630. Thus the fee awarded to William C. Barnard and the members of his firm is $460,550, which the court directs shall be paid from the fund available for distribution to the unrepresented claimants in the General Contractor Class.[14]

*Lee A. Freeman—Governmental Class.*

As court-appointed representative for the Governmental Class,[15] Lee A. Freeman and members of the firm of Freeman, Freeman & Salzman and Joseph Cooper, his San Francisco associate, request attorneys' fees in the sum of $1,365,800 based upon:

(1) a claim of 15 percent of the recoveries to be realized by governmental entities not represented by other attorneys specifically or in statewide classes, which amounts to approximately $865,800 (for this purpose the specifically named plaintiffs for whom Mr. Freeman is attorney of record in this litigation shall be included as plaintiffs not represented); and

(2) An additional claim of $500,000 from the non-governmental fund (all funds less that portion allocated to the Governmental Class) by reason of the substantial contributions made to the success of the litigation, which benefited all classes and which went beyond counsels' obligation to the class they represent.

14. The amount available for distribution to this class is approximately $7,900,000, with about 90% thereof distributable to unrepresented claimants and 10% thereof distributable to represented claimants.

15. The Governmental Class will share in 10% of the settlement fund, that is to say, in excess of $7,400,000. The unrepresented members of the class constitute about 92% thereof and the represented members about 8% thereof.

As of December 31, 1973, the record discloses that the services rendered by Mr. Freeman and his associates were as follows:

| | | Hours Involved | | |
|---|---|---|---|---|
| | | Senior Partners | | Associates |
| **August 1967–April 1968** | | | | |
| 1. | Investigation of facts<br>—Marketing practices<br>—Industry economics<br>—Group activities | Freeman | 185 | Salzman 168 |
| 2. | Research of legal issues<br>—Study of previous proceedings involving gypsum companies<br>—Analysis of developing case law | Freeman | 122 | Salzman 312 |
| 3. | Conferences with clients, public entity users and industry personnel | Freeman | 73 | Salzman 32 |
| **April 1968 to March 1971** | | | | |
| 4. | Preparation of pleadings, follow-up of ensuing developments<br>—Meetings with other plaintiffs' counsel | Freeman<br>Hanley | 5<br>401 | |
| 5. | Pretrial discovery<br>—Document inspection<br>—Depositions<br>—Meetings and conferences—Max Blecher | Freeman<br>Hanley | 719<br>39 | |
| 6. | Dealer trial (2/25/69–3/-18/71)<br>—Close contact and conference with Furth<br>—Analysis of materials to be used at trial<br>—Review of all documents and deposition transcripts | Freeman | 100 | Davidow 620 |
| 7. | Dealer trial (con't)<br>—Preparation of drafts of memo of law<br>—Preparation of pretrial settlement of facts<br>—Legal memo on Robinson-Patman issues<br>—Assistance in preparation of trial brief | Freeman | 140 | Davidow 500 |

| | Hours Involved | | | |
|---|---|---|---|---|
| | Senior Partners | | Associates | |

**April 1968 to March 1971**

8. Analysis and consultation on dealer damage issues — Freeman 50

**March 1971–December 31, 1973**

| | Senior Partners | | Associates | |
|---|---|---|---|---|
| 9. Meetings and conferences with Furth and plaintiffs' counsel | Freeman | 230 | Voortman | 25 |
| | Scarpulla | 71 | | |
| | Cooper | 105 | | |
| 10. Pretrial conferences | Freeman | 150 | Voortman | 206 |
| 11. Development of transactional information | Freeman, Jr. | 72 | Voortman | 309 |
| | Salzman | 112 | | |
| | Scarpulla | 37 | | |
| 12. Legal research —Indirect purchaser and pass on —Collateral estoppel —Venue —Statute of limitations —Class action issues | Salzman | 136 | Voortman | 860 |
| | Scarpulla | 35 | | |
| | Cooper | 67 | | |
| 13. Discovery —Interrogatories —Document inspection | Freeman | 81 | Voortman | 150 |
| | Salzman | 62 | Krepps | 32 |
| | | | Paralegal | 250 |
| 14. Class action procedural problems —Form of notice —Sharing of costs —Computer programming —Analysis of opt-outs | Freeman | 83 | Krepps | 100 |
| | Freeman, Jr. | 19 | Tedeschi | 61 |
| | Cooper | 431 | Paralegal | 215 |
| 15. Damage and statistical studies | Freeman | 52 | Tedeschi | 21 |
| | Cooper | 36 | Paralegal | 135 |
| 16. Negotiation of interclass allocation agreement | Freeman | 102 | Tedeschi | 20 |
| | Cooper | 68 | | |
| 17. Negotiation of settlements —Consultation with Furth and national class representatives —Negotiating sessions with defendants' counsel —Drafting of agreements | Freeman | 330 | | |
| | Cooper | 168 | | |
| 18. Report and consultation with clients on each phase of development | Freeman | 215 | | |
| | Freeman, Jr. | 100 | | |
| | Scarpulla | 19 | | |
| | Cooper | 65 | | |
| 19. Research and memo in support of settlement | Freeman | 35 | | |
| | Cooper | 112 | | |

| | Hours Involved | | | |
|---|---|---|---|---|
| | Senior Partners | | Associates | |
| **March 1971–December 31, 1973** | | | | |
| 20. Preparation of plans of distribution<br>—Meetings with counsel<br>—Investigation of statistical material available<br>—Statistical tables<br>—Form of notice to class members<br>—Supervision of printer and computer company | Freeman<br>Cooper | 105<br>91 | Paralegal | 400 |
| 21. Liaison functions | Cooper | 85 | | |

———◆———

The foregoing shows that between August, 1967, and December 31, 1973, Mr. Freeman and his associates devoted the following time to this litigation: 5,108 hours for partners, 3,416 hours for associates, and 1,000 hours of paralegal time. Applying $100 per hour for partners, $50 per hour for associates, and $15 per hour for paralegal, the total for such hourly services is $696,600 ($510,800 plus $170,800 plus $15,000). To this figure $12,100 should be added, representing 121 hours of services by Mr. John F. Meyer for his representation of the State of Illinois and the public entity class members thereof. This brings the total figure to $708,700. The unquestioned skills of counsel for this class, the risk involved, although not as great as that of the First Owner-Builder Class, and the substantial contribution made to the entire litigation and all classes thereof over a period in excess of six years justifies application of a multiple weighted factor of 1.75. This brings the total fee to December 31, 1973, to $1,240,225. Since 2,406 hours of administrative services have been rendered and an additional 900 hours of such services will be required to bring this litigation to a close, this total of 3,306 hours at $30 per hour adds an additional $99,180, for a grand total of $1,339,405. This compares favorably with petitioner's request for $1,365,800.

Accordingly, the court awards Lee A. Freeman the sum of $1,339,405, to be paid from the following sources:

(1) the sum of $865,800 to be paid from the funds distributable to all members of the governmental and statewide classes not represented by other counsel and the funds distributable to the states and governmental entities represented by Mr. Freeman;[16] and

(2) the sum of $473,605 from the total fund available for distribution to all classes other than the Governmental Class.

16. The specifically named plaintiffs for which Lee A. Freeman acted as counsel of record in this litigation are:

| | |
|---|---|
| State of Illinois (Statewide class action) | No. 49006 |
| State of West Virginia (Statewide and national class action) | No. 49019 |
| State of Indiana (Statewide class action) | No. 51004 |
| Chicago Housing Authority | No. 51149 |
| Board of Trustees of the University of Illinois | No. 51715 |
| Metropolitan Government of Nashville and Davidson County (Statewide class action) | No. 70–18 |
| State of Colorado (Statewide class action) | No. 70–702 |
| State of Nevada (Statewide class action) | No. 71–917 |

*Other Counsel.*

Although the services of other counsel must be judged by the same factors which entered into the court's determination of the fees awarded liaison counsel and counsel acting as class representatives, it is primarily to their contracts with their respective clients that such counsel must turn for their recompense. Hence the fees hereinafter awarded to such counsel are based exclusively on those services which transcended their obligations to their clients and contributed significantly to the success of the litigation and the settlement fund realized thereby.

*Joseph L. Alioto.*

The services rendered by the firm of Joseph L. Alioto were substantial and they contributed to the success of the litigation; however, the court finds the application of the Alioto firm for a fee of $3,000,000 to be highly exaggerated and completely untenable. It will evaluate the services of that office by the same standards applicable to all others, bearing in mind that the Alioto office was one of the first to enter this litigation, participated actively in the early stages thereof, vigorously pursued motions to produce under Rule 34 of the Federal Rules of Civil Procedure and participated alone or in concert with Mr. Furth in the taking of twenty-three significant depositions. For the above mentioned services Joseph L. Alioto, Maxwell R. Blecher, Guido Saveri and Joseph R. Hicks, all experienced and skilled antitrust lawyers, devoted "at least 1,750 hours" of their time up to the date of the filing of their application for attorneys' fees and by April 1, 1974, Mr. Saveri had devoted another 75 hours thereto, bringing the total time of such counsel to 1,825 hours, which based

on a fee of $100 per hour brings the hourly value of their services to $182,500. Considering the high risk involved in the early stages of the litigation and the substantiality of their contribution which benefited all classes, the court finds it appropriate to apply a multiple weighted factor of 2, thereby bringing the total fee to which the Alioto firm is entitled as of April, 1974, to $365,000. Giving this firm credit for an additional 100 hours of administrative services with the Claims Review Committee of the Applicator-Subcontractor Class at $30 per hour, the court adds an additional $3,000, thereby bringing the total fee earned by the Alioto firm to $368,000. From this sum the court deducts the retainers received in the sum of $12,650 and the fees received in the "dealer" cases in the sum of $31,150.[17] This results in a total of $324,200 as the appropriate reasonable fee to be awarded to Joseph L. Alioto, which the court directs shall be paid from the total fund available for distribution to all classes.

*Robert H. Weir.*

Robert H. Weir, counsel for three of the dealer plaintiffs in the pilot "dealer" cases, in his own behalf and that of John H. Boone, associated with him in those cases, seeks an award of attorneys' fees in the sum of $357,925 for 3,579.25 hours of services, which he asserts directly contributed to the creation of the settlement fund for all classes in this litigation. This claim is supported and corroborated by a detailed thirty-page schedule of his services rendered. As the court noted at the time it awarded attorneys' fees in the "dealer" cases:

> Should plaintiffs in other related and pending gypsum wallboard cases recover damages in further proceedings, the court in allowing attorneys'

17. In making this award the court has taken into consideration and holds the Alioto firm to its waiver in open court of any further or contingency fee from any client (plaintiff) it represents, including any interest it may have in the cases wherein Elwood S. Kendrick appears as counsel of record for plaintiffs. Further reference to this waiver as it affects any fee award to Mr. Kendrick will be hereinafter made. This award in no way affects the yet to be tried cases of Universal Wallboard v. National Gypsum Company, Civil Nos. 46756 and 71–1211, wherein plaintiff opted out of the settlement and from which, if successful, the Alioto firm should receive substantial attorneys' fees.

fees in such cases will undoubtedly take into consideration the size of the allowance already made in these cases and the extent to which services already rendered are utilized in the further proceedings. Wall Products Co. et al. v. National Gypsum Co. et al., D.C., 367 F.Supp. 972, 976.[18]

With the foregoing considerations in mind, the court further notes that when it awarded attorneys' fees in the "dealer" cases it disallowed 40 percent of the hourly services claimed because the issues to which the disallowed time was addressed were not significant to plaintiffs' success in those cases. However, the time employed on those issues became relevant and substantial in the "backburner" cases and the ultimate favorable settlement thereof. Hence the court finds that the claim of 40 percent of $357,925 is amply supported by the record and constitutes reasonable attorneys' fees to Mr. Weir and Mr. Boone for their contribution to the settlement achieved for all cases and all classes.

Accordingly, the court awards attorneys' fees to Robert H. Weir and John H. Boone in the sum of $143,170 and directs that the same shall be paid ·from the total fund available for distribution to all classes.

*David A. Berger*

David A. Berger, whose firm represents 349 named plaintiffs and other claimants in this litigation, seeks attorneys' fees in the sum of $450,000. He has contingency contracts with these clients ranging from 25 to 40 percent of their recoveries. Hence the court reminds counsel that it is to these clients, from whom he will receive substantial fees, that he must look for remuneration for services rendered primarily in their behalf. Nevertheless, the court recognizes that some of Mr. Berger's efforts and those of the members of his firm did inure to the benefit of unrepresented members of all classes in this litigation.

The following is a table of such services, set forth annually:

| Attorney | 1968 | 1969 | 1970 | 1971 | 1972 | 1973 | Total |
|---|---|---|---|---|---|---|---|
| David Berger | 4.0 | 32.0 | 33.0 | 112.5 | 41.5 | 68.0 | 291 |
| Herbert Newberg | 9.0 | 110.0 | 89.0 | 42.0 | | | 250 |
| H. L. Montague, Jr. | 1.0 | 73.5 | 12.4 | 10.25 | 73.50 | 141.50 | 312.1· |
| H. L. Schambelan | | 85.5 | | | | | 85.5 |
| Paul McMahon | | | | | 264.75 | 8.75 | 273.5 |
| Warren D. Mulloy | | | | | | 27.0 | 27 |
| Bruce K. Cohen | | | | | 5.5 | 24.5 | 30 |
| Gerald J. Rodos | | | | | 3 | | 3 |
| Joseph R. Lally | | | | 4.5 | | | 4.5 |
| Merill G. Davidoff | | | | | | 22.5 | 22.5 |
| S. J. Greenfogel | | | | | | 84.75 | 84.75 |
| Totals | 14 | 301 | 134.4 | 169.25 | 388.25 | 377 | 1383.9 |

Additionally, Mr. Montague of petitioner's firm devoted 34.75 hours to this litigation in 1974 which is not reflected in the above table, making a total of 1,418.65 hours. At $100 per hour for the 291 hours of services by Mr. Berger

18. The aggregate of the fees received by Mr. Weir and his associates from his clients in the "dealer" cases was $517,410.

and $50 per hour for the remaining 1,127.65 hours of services by his associates, the total fee for such hourly services is $85,482 ($29,100 plus $56,382). However, in view of the large number of plaintiffs that counsel represents, it is reasonable to infer that at least one-fourth of this time also served to benefit his clients. Accordingly, the amount awarded David A. Berger is the sum of $64,112, which the court directs shall be paid from the funds available for distribution to the unrepresented claimants in all classes.

*Elwood S. Kendrick.*

Elwood S. Kendrick seeks attorneys' fees in the sum of $310,000 for services rendered on behalf of the unrepresented claimants in this litigation in the First Owner-Builder and Contractor Classes, and in particular for services rendered since the trial of the dealer cases. Petitioner entered this litigation in April of 1967 and has attended approximately thirty-five conferences and pretrial hearings in San Francisco, Chicago, Philadelphia and Washington, D. C. He asserts that the time expended for such purposes consisted of 450 hours of his time, 390 hours of services of associate counsel and 548 hours of paralegal time. However, the court notes that some of these services were duplicative of the services rendered by representative counsel for the established classes and that a substantial portion of such time was devoted to the requirements (e.g., transaction interrogatories) of the approximately 156 named plaintiffs he represents in the First Owner-Builder, Contractor and Dealer-Wholesaler Classes on contingency contracts calling for fees ranging from one-third to forty percent of their recoveries. Furthermore, as noted above, the Alioto firm has waived its share of all contributions payable to it in those cases wherein Mr. Kendrick associated the Alioto firm. Therefore, the court after evaluating the time employed that could be said to have benefitted the First Owner-Builder and Contractor Classes, finds that it consists of 250 hours of Mr. Kendrick's time and 140 hours of the time of associate counsel. Accordingly, the court finds a reasonable fee payable to Elwood S. Kendrick to be $32,000 ($25,000 plus $7,000) payable as follows: $16,000 from the fund distributable to the unrepresented claimants in the First Owner-Builder Class and $16,000 payable from the fund distributable to the unrepresented claimants in the Contractor Class.

*Arent, Fox, Kintner, Plotkin & Kahn.*

The law firm of Arent, Fox, Kintner, Plotkin & Kahn, which represents 233 First Owner-Builder plaintiffs, 4 First Owner-Builder and General Contractor plaintiffs, 11 General Contractor plaintiffs and a substantial number of other claimants, who for the purposes of this litigation must be deemed as unrepresented claimants, has requested attorneys' fees for services rendered up to April 1, 1974, in the sum of $83,845. These services, petitioners assert, were services which directly benefitted the entire First Owner-Builder Class. They have submitted in detail a specific description of the services rendered which appears to support their claim. The schedules submitted reflect that 938.3 hours were devoted to such services up to December 31, 1973, and 615.5 hours thereafter up to April 14, 1974. Based upon the firm's billing rate for all counsel (partners or associates) of $50 per hour prior to 1973 and $60 per hour thereafter, their time schedules show total earned fees of $83,845 ($46,915 plus $36,930). These fees the court finds to be reasonable. However, though counsel attributes the above described services to services for the benefit of all members of the class, the fact remains that their numerous clients (plaintiffs in this litigation) who are members of the class will also benefit from these services as well as from all other services rendered on their behalf, which are not encompassed in the present petition. For these services such clients will pay contingency fees from two-ninths to one-third of their recovery. According-

ly, after careful review of the services rendered, the court finds it proper to deduct one-half of the amount claimed. This brings the fee to which counsel are entitled as of April, 1974, and which the court finds to be reasonable, to $41,922. In the course of the litigation Mark R. Joelson, a member of the firm, has been most active in the work of the Claims Review Committee for the First Owner-Builder Class. He and other lawyers from the firm have devoted a total of 1,050 hours in administrative services and are expected to devote another 1,000 hours thereto for a total of 2,050 hours before completion of their responsibilities in this litigation. At $30 per hour this entitles the firm to an additional $61,500, for a total of $103,422, which the court directs shall be paid to the firm of Arent, Fox, Kintner, Plotkin & Kahn from the fund available for distribution to the unrepresented claimants in the First Owner-Builder Class, the direct beneficiaries of their services.

### Howard, Prim, Rice, Nemerovski, Canady & Pollak.

Howard, Prim, Rice, Nemerovski, Canady & Pollak, as counsel for approximately 530 named plaintiffs, petitioned the court for attorneys' fees in the sum of $50,838, based upon services which they assert benefitted the members of all classes in this litigation. A summary of the time expended through December 31, 1973, shows the following:

| | Senior Partners | Junior Partners | Associates | Paralegal |
|---|---|---|---|---|
| Pre-Class | 38 | 73 | 293.1 | |
| Discovery | | 1.8 | 658.2 | 299.3 |
| General Class | | 140 | 329.2 | |
| TOTAL HOURS | 38 | 214.8 | 1,280.5 | 299.3 |

A breakdown of the foregoing schedule reveals a total of 252.8 hours of service of senior and junior partners, 1,280.5 hours of service of associates and 299.3 hours of paralegal assistants. Applying the hourly rates of $100 for partners, $50 for associates and $15 for paralegal services, the total fee requested is $93,794 ($25,280 plus $64,025 plus $4,489). While there is no doubt that the services rendered by this firm contributed to the overall success of the litigation, particularly when it answered in detail the transaction interrogatories for its 530 named plaintiffs and thereby demonstrated their ability to meet the remoteness issue and prove their damages, a matter of particular import to the First Owner-Builder Class, the fact remains that most of these services were in fulfillment of counsel's basic obligation to their clients with whom they have contingency contracts calling for fees ranging from 23 to 35 percent of all recoveries obtained in their behalf. On balance, the court finds it fair and reasonable to attribute one-third of the services above indicated to have benefitted all classes and in particular the First Owner-Builder Class. Accordingly, the court awards $31,264 (one-third of $93,794) to the firm of Howard, Prim, Rice, Nemerovski, Canady & Pollak as reasonable attorneys' fees, and directs that the same shall be paid from the fund available for distribution to the unrepresented claimants in the First Owner-Builder Class.

### Lewiston-Steinhardt.

Michael B. Lewiston, of the firm of Bodman, Longley, Bogle, Armstrong & Dahling and Frederick D. Steinhardt of the firm of Goldman, Mason & Steinhardt, as attorneys for one of the largest groups of First Owner-Builder plaintiffs, seek attorneys' fees from the fund available for distribution to the unrepre-

sented claimants in the First Owner-Builder Class in the sum of $86,510. The time they devoted to this litigation and which they assert benefitted all members of the First Owner-Builder Class is 659 hours. Included in this time were conferences with counsel and pretrial hearings in San Francisco, Philadelphia, Washington, D. C. and Chicago. A breakdown and analysis of these 691 hours satisfies the court that 215 of these hours were devoted to services essential to the fulfillment of counsel's obligations to their clients and that while the remaining 484 hours could well have benefitted members of classes other than their specific clients, much of this time also benefitted their clients, who are very substantial in number and with whom counsel have contingency contracts calling for one-third of their recoveries. Under the circumstances, the court credits 242 of these hours as directly beneficial to the outcome of this litigation and at a rate of $100 per hour results in a reasonable fee of $24,200, which the court directs shall be paid to Michael B. Lewiston and Frederick D. Steinhardt from the funds available for distribution to the unrepresented claimants in the First Owner-Builder Class.

### John Edward Burke.

John Edward Burke and the firm of Ross, Hardies, O'Keefe, Babcock & Parsons, as counsel for the Home Builders of Greater Chicago, No. 70–210, and approximately 245 named plaintiffs with whom they have contingency contracts calling for 25 percent of their recovery, have petitioned the court for attorneys' fees in the sum of $50,000 from that part of the settlement fund distributable to all unrepresented claimants in all classes. Their services were part of the team effort and there is no doubt in the court's mind that counsel's active participation in at least twenty meetings of counsel and pretrial hearings in Washington, D. C. and San Francisco and active participation in the settlement negotiations contributed to the overall settlement. For such purposes the firm devoted 530 hours of service by partners of the firm and at $100 per hour this would entitle them to a fee of $53,000. However, the fact remains that these services were also essential to the cause of their clients to whom they must look for their basic remuneration. Accordingly, on balance, the court finds a reasonable fee payable to such counsel to be 60 percent of $53,000, or $31,800, which the court directs shall be paid to the firm of Ross, Hardies, O'Keefe, Babcock & Parsons from the settlement fund distributable to all unrepresented claimants in all classes.

### Cochrane & Bresnahan.

The firm of Cochrane & Bresnahan, counsel in eight First Owner-Builder cases and two Applicator cases, seeks attorneys' fees in the sum of $52,800. This is based on 660 hours of attorneys' services averaged out at $80 per hour. Based upon the court's analysis of the services of each of the named attorneys in the petition, the court finds such allocation between senior counsel and associate counsel to be fair and reasonable. While these services are asserted to have benefitted the unrepresented members of the First Owner-Builder and Applicator Classes,[19] the court is eminently satisfied that at least one-half of that time must be credited to services needed to fulfill counsel's essential obligations to their clients with whom they have contingency fee contracts.[20]

Accordingly, the court finds the sum of $26,400 to be reasonable attorneys' fees to be awarded the firm of Cochrane & Bresnahan and directs that $23,074 thereof shall be paid from the fund available for distribution to the un-

---

19. The services rendered were allocated to the respective classes in the following ratio: 12.6% to the Applicator Class and 87.4% to the First Owner-Builder Class.

20. Counsel represent more than 100 named plaintiffs with contingency contracts calling for fees ranging from 25 to 35% of the recoveries obtained (R.T. 332, hearing of Apr. 23, 1974.)

represented claimants in the First Owner-Builder Class and that $3,326 shall be paid from the fund available for distribution to the unrepresented claimants in the Applicator-Subcontractor Class.

### Allan R. Carpenter, Jr.

Attorney Allan R. Carpenter, Jr. seeks attorneys' fees equal to five percent of the entire fund available for distribution to the members of the General Contractor Class, whether represented or unrepresented. This would amount to approximately $395,000. This is an exaggerated and untenable request. Counsel asserts that 1,707 hours of his time and that of his associates were devoted to this litigation and that only 591.5 hours of such services were devoted to the direct needs of his specifically identified clients. This would leave 1,115.5 hours of service for the benefit of the members of the General Contractor Class. Counsel did not enter this litigation until July 27, 1972, when he sought to intervene on behalf of his client Rossmoor Corporation in the General Contractor Class in the case of Terrace Homes v. United States Gypsum Co. et al., No. C-70–2678, and he now lists 43 intervenor plaintiffs in four classes as his clients. His contracts with these plaintiffs call for contingency fees ranging from twenty-five to thirty-five percent of the recoveries.

There is no question that after he got into this litigation Mr. Carpenter made some contribution to the benefit of all members of the General Contractor Class. However, much of his work was duplicative in character and a substantial number of those 1,115.5 hours also served the particular needs of his clients. The court therefore finds that only 40 percent of this suggested time can be deemed a contribution to the General Contractor Class. Accordingly, the court, using a weighted average of $80 per hour for senior and associate counsel, awards Allan R. Carpenter, Jr. attorneys' fees in the sum of $35,696 (446.2 hours at $80), which the court directs shall be paid from the fund available for distribution to the unrepresented members of the General Contractor Class.

### Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle.

The firm of Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle, which represents plaintiff in the case of Roundy v. Kaiser Gypsum Company, Inc., No. C 51436, has petitioned for attorneys' fees in the sum of $10,000. The court finds no basis in fact for their claim that they rendered services that benefitted the members of the classes involved in this litigation and accordingly denies their request for attorneys' fees.

### George W. Liebmann.

■ Mr. George W. Liebmann and the firm of Frank, Bernstein, Conaway & Goldman claim no specific amount, but request such "fees as the court may award in its sound discretion." Since these attorneys represent plaintiffs in one case, Doccolo et al. v. Kaiser Gypsum Co. et al., No. C–71–691 (D.Md.), with whom they have contingency fee contracts, and it appearing that they made no significant contribution to the settlement fund, their request for attorneys' fees is denied. The costs of their clients were heretofore awarded to them. For their fees they must look to their contingency fee contracts.

### Stephen J. Schwartz.

■ Mr. Stephen J. Schwartz has requested attorney's fees in the sum of $3,000. He is not an attorney of record for any of the named plaintiffs in this litigation and predicates his request for services apparently rendered while in the employ of or in association with other counsel in this litigation. It is to such counsel that he must turn if he has any just cause for further compensation. This request for attorney's fees is denied.

### Terry C. Schmalz.

While the fee request of Terry C. Schmalz is a mere $50, the court finds

no basis for awarding the same since counsel merely represents a member of one of the classes and has made no contribution to this litigation. This request for attorney's fees is denied.

*Independently Represented States.*

In addition to the states represented by counsel for whom fees have hereinabove been provided,[21] there are a number of independently represented states whose fee requests must be individually evaluated. The awarding of attorneys' fees for such independently represented states presents substantial and difficult problems which the court has endeavored to resolve as equitably as possible in order to avoid unjust discrimination at the expense of the smaller states and in particular those states which through the efforts of their counsel have played an aggressive and vigorous role in the prosecution of this litigation to the benefit of either all unrepresented members of all classes or all unrepresented members of the governmental class. In so doing the court is not unmindful that the attorney general of a state is charged by law with the duty of representing the state and its citizens and that funds are generated by the taxing powers of the state for the operations of such office and presumably for the expenses of such office as well. The states deserving special attention will be hereinafter specifically identified.

*Arizona, North Dakota and South Dakota—Meyers & Curtis.*

▉ The firm of Meyers and Curtis and Donald D. Meyers as counsel for the states of Arizona, North Dakota and South Dakota have applied for attorneys' fees in the sum of $84,000 against the entire settlement fund. Counsel have contracts with the states of North Dakota and South Dakota that call for one-third of their recoveries and have been retained by the state of Arizona at an hourly rate not to exceed $50 per hour, with the Arizona fee to be contin-

gent upon and payable out of its recovery in the litigation. The statute of Arizona, Article 5, Section 41–191–D of the Arizona Revised Statutes provides that the court in which an antitrust case is pending has authority to set a fee in conjunction with any given case and the court awarded fee shall be paid in lieu of the fee provided by the statute. Since the fees about to be awarded are to be divided equally and shared in equally by the states of Arizona, North Dakota and South Dakota, these awards shall be deemed part of the recovery of each state and not as attorneys' fees within the meaning of the Arizona statute. This is to prevent any inequity or misinterpretation as to the intent of the court in awarding fees and the effect thereof on the fees received or to be received by the firm of Meyers & Curtis.

These attorneys devoted 764 hours of service to this litigation, and while the bulk of the services were for the direct benefit of their clients, a substantial portion of these services were devoted to the taking of the depositions of single plant producers of gypsum products, namely American Gypsum, Republic Gypsum and Big Horn Gypsum, and motions for them to produce documents. At least one-third of such services directly benefitted all classes. Accordingly, the court awards $25,500 (255 hours at $100) as attorneys' fees to the states of Arizona, North Dakota and South Dakota as part of the recovery of each of these states to be divided among them in equal shares of $8,500. Said award shall come from the fund available for distribution to the unrepresented claimants in all classes.

*New Mexico, New Jersey, Maryland, Connecticut, The Mayor and City Council of Baltimore, Baltimore County, and The City and County of Denver—Specks & Goldberg.*

▉ The members of the firm of Specks & Goldberg are attorneys of rec-

---

21. Illustrative of the states to which counsel fees have already been awarded are those represented by Mr. Lee A. Freeman, namely, Illinois, West Virginia, Indiana, Tennessee, Colorado and Nevada.

ord in case No. C 71–939, wherein the plaintiffs are the states of New Mexico, New Jersey, Maryland, and Connecticut, The Mayor and City Council of Baltimore, Baltimore County, and City and County of Denver. Their retainer agreements with these listed plaintiffs provide for the payment of contingency fees in such amounts as shall be awarded by the court. They now request that the court award them attorneys' fees as follows: (a) a fee of 15 percent of the recovery achieved by the named plaintiffs listed above, and (b) a fee of 15 percent of the recovery achieved by the class members in the statewide governmental classes of the states of New Mexico, New Jersey, Maryland and Connecticut. The record reflects that the time devoted by skilled and experienced antitrust attorneys Perry Goldberg, Granvil I. Specks and Joseph D. Cooper to this litigation is 438 hours and that of counsel associated with them on behalf of the states of New Mexico, Maryland and Connecticut is 95 hours, for a total of 533 hours. Their record of services rendered amply supports and justifies the granting of counsel's request as fair and equitable, and, in the court's judgment, reasonable attorneys' fees. Accordingly, the court awards the firm of Specks & Goldberg attorneys' fees as above requested.

### California—The Attorney General of the State.

■■■ The Attorney General of the State of California, Evelle J. Younger, seeks attorneys' fees equal to 10 percent of that portion of the settlement fund available for distribution to the California statewide governmental class. This is a fair and reasonable request which the court approves as the amount of attorneys' fees that may be deducted from that portion of the settlement fund available for distribution to the California statewide class and paid to Evelle J. Younger as Attorney General of the State of California. The court also notes that since the filing of its application for attorneys' fees, Assistant Attorney General Richard N. Light has devoted 125 hours of administrative services in the processing of claims in the governmental class. It is reasonable to expect him to devote another 75 hours to such work before the work of the Governmental Claims Review Committee is completed. Accordingly, for these 200 hours of administrative services the court awards $6,000 to the Attorney General of the State of California to be paid from the fund available for distribution to the unrepresented claimants in the governmental class.

### Oregon—The Attorney General of the State.

■■■ The Attorney General of the State of Oregon requests such reasonable attorneys' fees as the court may award.[22] He asserts that 135.5 hours of the time his staff attorneys, Edward Nugent and James Durham, experienced antitrust lawyers, devoted to this litigation were for the direct benefit of the state and its political entities and that 151.50 hours thereof were to the direct benefit of the settlement fund distributable to the governmental class. While the petition does not spell out the specific services rendered for the benefit of the governmental class, a review of their detailed time sheets over the past four years reflects activity in specific areas including eleven conferences and pretrial hearings in San Francisco and one conference of counsel in Chicago which could well be attributable to services for the benefit of the entire governmental

---

22. The laws of Oregon provide in part as follows:

ORS 180.095(3):

All sums of money received by the Department of Justice under a judgment, settlement or compromise, including damages, attorney fees, costs, disbursements and other recoveries, in actions and suits under the federal antitrust laws shall, upon receipt, be deposited with the State Treasurer. . . .

class. The court therefore finds that of the 151.50 hours claimed, one-half thereof can be said to have benefitted the governmental class. Accordingly, the court awards attorneys' fees for such services in the sum of $7,575 (75.75 hours at $100) which it directs shall be paid to the Department of Justice of the State of Oregon from the funds available for distribution to the unrepresented members of the governmental class.

### Idaho—Richard R. Greener.

 Mr. Richard R. Greener, counsel for the state of Idaho, requests approval of his contingency fee agreement with the state requiring payment to him of 20 percent of the net recovery to the state of Idaho and political subdivisions and entities therein. This was an agreement fairly entered into, and, considering that the recovery of the state of Idaho will be relatively small and that Mr. Greener has already spent in excess of 100 hours of his services in its behalf and is likely to devote another 30 hours of work to this litigation before the settlement funds are distributed, the court finds this 20 percent agreement to be fair and reasonable and therefore approves the same.

### Washington, Wisconsin and Kansas.

These states, through their counsel, have made substantial contributions to the success of this litigation in the manner hereinafter indicated, which contributions in the court's considered judgment went beyond their obligations to their respective states. The services of each state will be separately considered and evaluated.

### Washington.

 The state of Washington, through its Special Assistant Attorney General, Culp, Dwyer, Guterson and Grader, first entered this litigation on July 5, 1969, and have actively participated therein ever since. They request attorneys' fees in the sum of $74,728, which they assert represents compensation at the rate of $80 per hour (it is actually approximately $74 per hour) for the time of the attorneys, particularly William L. Dwyer and Jerry R. McNaul, experienced antitrust lawyers. A summary of their schedule of services as of April, 1974, reflects the following:

| | | |
|---|---|---|
| 1. | Legal research in connection with the dealer cases | 104.60 |
| 2. | Pretrial conferences and joint plaintiffs meetings (23 in number) | 237.10 |
| 3. | Work of Subcommittee of 3 states to propose damage data form | 85.00 |
| 4. | Answering transaction interrogatories | 109.60 |
| 5. | Analyzing proposed allocation agreement | 27.50 |
| 6. | Allocation of settlement fund between states | 15.10 |
| 7. | Class action research | 144.60 |
| 8. | Research on pass-on and remoteness issues | 56.20 |
| 9. | Damage analysis | 34.70 |
| 10. | Other time | 119.70 |
| 11. | Time since filing of petition | 80.50 |
| | TOTAL HOURS | 1,014.60 |

It is evident from the foregoing and the details accompanying each item that much of the time was spent for the benefit of all parties and all classes in this litigation. Illustrative thereof are the 104.60 hours devoted to the pilot "dealer" cases, 85 hours devoted to the work of the subcommittee of three states and the 56.20 hours devoted to research on the pass-on and remoteness issues. Under the circumstances and bearing in mind that the recovery of the state of Washington is not likely to be sufficient to warrant full compensation of counsel for their time and effort, the court finds it eminently fair to attribute one-half of the time devoted by counsel to this litigation as time directly benefitting the unrepresented claimants in all classes. Accordingly, the court awards

and directs payment to the state of Washington the sum of $37,362 to be paid as attorneys' fees from the fund available for distribution to the unrepresented claimants in all classes. These fees when added to the recovery the state of Washington will receive should then prove adequate to properly compensate counsel under their contingency fee contract.

*Wisconsin.*

The state of Wisconsin, through Assistant Attorney General Bruce A. Craig and George F. Sieker (now deceased), first entered this litigation with the filing of its action in June of 1969. Since that time both of these experienced antitrust attorneys have been involved in the prosecution of this litigation. Mr. Craig requests compensation in the sum of $59,500, which represents compensation at the rate of $70 per hour for 850 hours of time devoted by Mr. Craig and Mr. Sieker to the litigation. Together, they participated in at least seventeen depositions, conferences and pretrial hearings in San Francisco, New York and elsewhere. They were particularly effective in the taking of the deposition of and preparation for the cross-examination of Dr. Crutchfield, the defendants' economics expert in the trial of the "dealer" cases, and they aided in the preparing of the testimony of Professor Willard Mueller of the University of Wisconsin as an expert witness on behalf of plaintiffs to counteract the testimony of Dr. Crutchfield. An additional area of substantial activity on the part of Mr. Craig was in the preparation of forms for the compiling of transaction data for all public bodies. The court is satisfied that at least half of the time employed by counsel for the state of Wisconsin directly served the interests of all classes and substantially contributed to the favorable result achieved. Accordingly, the court awards attorneys' fees to the state of Wisconsin in the sum of $29,750, which shall be paid from the fund available for distribution to the unrepresented claimants in all classes.

*Kansas.*

The state of Kansas retained Mr. J. F. Steineger as its counsel in this litigation. He entered this litigation in January of 1970 and prior thereto and since has devoted 1,401.9 hours to the litigation. He participated in numerous conferences and pretrial hearings in San Francisco and Chicago. Based upon attorneys' fees at the rate of $60 per hour (double that which the state in fact paid him under his retainer) his request for attorneys' fees is $84,114. A large portion of that time was devoted to services which went beyond his obligation to his clients and directly benefitted members of other classes and in particular the unrepresented members of the governmental class. He vigorously protected the interests of the smaller states. In fact, it was his suggested plan for distribution of the funds allocated to the governmental class, supported by the smaller independently represented states, which, after extended discussion in open court hearings, prevailed over two other plans submitted for the court's consideration. The court after careful review of the schedule of services rendered by Mr. Steineger is well satisfied that approximately half of his time benefitted the unrepresented members of the governmental class. Accordingly, the court awards attorneys' fees to the state of Kansas in the sum of $42,057, which the court directs shall be paid to the state of Kansas from the fund available for distribution to the unrepresented claimants in the governmental class.[23]

*Time of Payment of Fees.*

With the exception of those fees which counsel will receive pursuant to

---

23. Since the attorneys' fees to be added to the recovery of the state of Kansas are based upon an hourly rate of $60, whereas its contract with Mr. Steineger calls for only $30 per hour, the state is free within its power and discretion to make any adjustment it deems fair in the premises.

contracts with their clients, as to all the fees hereinabove awarded, 75 percent of each fee awarded shall be paid to counsel or the states indicated immediately after this order becomes final and the remaining 25 percent thereof shall be paid at the direction of the court at the time of final payment of all approved claims.

A summary showing the fees requested, the fees awarded and the fund from which each fee shall be paid is appended hereto as Appendix "A."

Liaison counsel for plaintiffs is directed to forthwith prepare separate judgments awarding attorneys' fees to each of the attorneys and entities entitled thereto in accordance with this opinion. The court is aware of no just reason for delaying the entry of final appealable judgments for the award of attorneys' fees as set forth herein. Upon approval of said judgments, the court shall direct entry of final judgments thereon in accordance with the provisions of Rule 54(b) of the Federal Rules of Civil Procedure such that any appeals therefrom shall be taken immediately pursuant to Rule 4(a) of the Rules of Appellate Procedure.

Notices of entry of the final judgments shall be mailed to all attorneys who have submitted petitions for award of attorneys' fees.

APPENDIX "A"

SUMMARY OF FEES REQUESTED, FEES AWARDED
AND FUNDS FROM WHICH FEES SHALL BE PAID

| Attorney | Fees Requested | Fees Awarded | Fund from Which Fees shall be Paid |
|---|---|---|---|
| 1. Furth | $6,764,000 | $3,328,507 | Entire fund |
| 2. Seymour-Tydings | 3,382,000 | 1,611,495 | Unrepresented claimants of First Owner-Builder Class |
| 3. Kramer-Farella, et al. | 1,500,000 | 793,614 | Unrepresented claimants of Wholesaler-Dealer Class |
| 4. Kronfeld | 2,000,000 | 764,480 | Unrepresented claimants of Applicator-Subcontractor Class |
| 5. Barnard | 790,000 | 460,550 | Unrepresented claimants of General Contractor Class |
| 6. Freeman | 1,365,000 | 1,339,405 | $865,800 from funds distributable to all claimants of Governmental and Statewide Classes not represented by other counsel and the funds distributable to states and governmental entities represented by Freeman, and $473,605 from total fund available to all classes other than the Governmental Class |

| | | | |
|---|---|---|---|
| 7. Alioto | 3,000,000 | 324,200 | Entire fund |
| 8. Weir | 357,925 | 143,170 | Entire fund |
| 9. Berger | 450,000 | 64,112 | Unrepresented claimants in all classes |
| 10. Kendrick | 310,000 | 32,000 | $16,000 from unrepresented claimants in First Owner-Builder Class, and $16,000 from unrepresented claimants in General Contractor Class |
| 11. Arent, et al. | 83,845 plus special services | 103,422 | Unrepresented claimants of First Owner-Builder Class |
| 12. Howard, et al. | 50,838 | 31,264 | Unrepresented claimants for First Owner-Builder Class |
| 13. Lewiston-Steinhardt | 86,510 | 24,200 | Unrepresented claimants of First Owner-Builder Class |
| 14. Burke-Ross, et al. | 50,000 | 31,800 | Unrepresented claimants of all classes |
| 15. Cochrane & Bresnahan | 52,800 | 26,400 | $23,074 from unrepresented claimants of First Owner-Builder Class, and $3,326 from unrepresented claimants of Applicator-Subcontractor Class |
| 16. Carpenter | 395,000 | 35,696 | Unrepresented claimants of General Contractor Class |
| 17. Schweppe, et al. | 10,000 | –0– | |
| 18. Liebmann | reasonable fee | –0– | |
| 19. Schwartz | 3,000 | –0– | |
| 20. Schmalz | 50 | –0– | |
| 21. Arizona, North Dakota, South Dakota (Meyers & Curtis) | 84,000 | 25,500 (8,500 to each state) | Unrepresented claimants of all classes |

| | | | |
|---|---|---|---|
| 22. New Mexico, New Jersey, Maryland, Connecticut, The Mayor and City Council of Baltimore, Baltimore County, and City and County of Denver (Specks & Goldberg) | 15 percent of all recoveries of named plaintiffs to be paid to their attorneys | 15 percent of all recoveries of named plaintiffs to be paid to their attorneys | As requested to be paid by the named plaintiffs and class members under this item |
| 23. California | 10 percent of California recovery plus special services | 10 percent of California recovery plus $6,000 | $6,000 from unrepresented claimants of Governmental Class, remainder from California's recovery |
| 24. Oregon | reasonable fee | 7,575 | Unrepresented claimants of Governmental Class |
| 25. Idaho (Richard R. Greener) | 20 percent of Idaho recovery | 20 percent of Idaho recovery | Idaho recovery |
| 26. Washington | 74,728 | 37,362 | Unrepresented claimants of all classes |
| 27. Wisconsin | 59,500 | 29,750 | Unrepresented claimants of all classes |
| 28. Kansas | 84,114 | 42,057 | Unrepresented claimants of Governmental Class |
| TOTAL | $20,953,310 plus special services and percentages from specific states and entities | $9,262,559 plus percentages from specific states and entities | |